# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIX ROLANDO HERNANDEZ,<br><br>　　　　Petitioner,<br><br>　v.<br><br>ANTHONY HEDGPETH,<br><br>　　　　Respondent. | Case No.  1:12-cv-00785-AWI-SAB-HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on January 12, 2009, of two counts of home invasion robbery (Cal. Penal Code §§ 211/213(a)(1)(A)).  (CT[1] 500-503.)  It was also found true that the principal discharged a firearm during the commission of those counts, causing death (Cal. Penal

---
[1] "CT" refers to the Clerk's Transcript on Appeal.

Code § 12022.53(d), (e)(1)).  (CT 500-503.)  In a bifurcated bench trial, the trial court convicted Petitioner of participating in a criminal street gang (Cal. Penal Code § 186.22(a)), and determined that he committed the robbery for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)).  (CT 543.)  Petitioner was sentenced to 156 years to life in prison.  (CT 555-600.)

On November 10, 2010, the California Court of Appeal for the Fifth District affirmed the judgment but remanded the case to the trial court to correct a sentencing error.

On December 6, 2010, Petitioner filed a petition for review in the California Supreme Court.  On February 16, 2011, the California Supreme Court granted review and transferred the case back to the Court of Appeal to specifically consider a sentencing issue.

On April 15, 2011, the Court of Appeal again affirmed the convictions but modified Petitioner's sentence.

Petitioner filed a federal petition for writ of habeas corpus in this Court on May 14, 2012.  On October 8, 2012, Respondent filed a motion to dismiss the petition for failure to exhaust state court remedies.  The undersigned issued a Findings and Recommendation on February 7, 2013, which recommended Petitioner be granted leave to file an amended petition; in the event Petitioner did not file an amended petition, the undersigned recommended that Respondent's motion be granted.  On June 7, 2013, Petitioner lodged an amended petition.  On June 20, 2013, the District Court adopted the Findings and Recommendation and directed the Clerk of Court to file the lodged amended petition.  On September 18, 2013, Respondent filed an answer to the amended petition.  Petitioner did not file a traverse.

## II.

## STATEMENT OF FACTS[2]

> On March 28, 2008, at about 9:00 or 10:00 p.m., defendant (nicknamed "Mellow") and Ortega (nicknamed "Little Demon") picked up 21-year-old Benita

---

[2] The Fifth DCA's summary of the facts in its November 10, 2010, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir.2009), cert. denied, 130 S.Ct. 1086 (2010) ("We rely on the state appellate court's decision for our summary of the facts of the crime."); Moses v. Payne, 555 F.3d 742, 746 (9th Cir.2009) ("For a summary of the preliminary facts, we rely on the appellate court's decision.").

(nicknamed "Cute") at her boyfriend's apartment. Ortega was driving a stolen Mazda Tribute sport utility vehicle (the SUV), the vehicle Benita had always seen him drive. He was wearing a red shirt, and both he and defendant were wearing red bandanas around their necks. They went to a house where they joined several other people, including Verdugo (nicknamed "Little Silent"), whom Benita had never met. Everyone at the party had been smoking methamphetamine and was "high" or "tweaking." At some point, Ortega pulled his red bandana over his face and took pictures of himself and defendant with a cell phone. When the methamphetamine started to run low, Ortega said they should go get more, and defendant agreed.

During the party, Benita was sending text messages to 27-year-old Regina. Ortega asked Benita if he could borrow her cell phone. Benita let him use the phone and when he returned it to her, she could see he had accessed her contacts list. He asked her, "Who is that girl Regina in your phone?" Benita said she was a friend. Ortega asked Benita if she wanted a ride to Regina's home. Benita said she wanted a ride to her own home, but Ortega insisted on taking her to Regina's home. Ortega asked her if Regina still sold drugs and Benita replied that she did. Ortega said, "All right[,] I'm going to take you to Regina's."

At about 1:45 a.m., Ortega got in the SUV. Benita got in the passenger seat and defendant and Verdugo got in the back seat. Ortega's rifle was between the seats by his right leg; Benita had always seen him with it. He frequently played with it and she had seen him shooting chickens with it in the mountains. As they drove to Regina's apartment, Ortega passed the rifle to the back seat. Ortega parked the SUV about half a block from Regina's apartment, on a side street perpendicular to the alley that ran behind the apartments. Everyone got out of the SUV and Ortega told Benita to go inside. Benita thought they were just going to drop her off, but they said they were going to another house nearby. Ortega told Benita to contact them when she was ready to leave Regina's.

Benita walked down the alley and knocked on Regina's back door because Regina was usually in the back bedroom on the back side of the apartment. No one answered, so Benita went to the front door and rang the doorbell. Again no one answered, so she left and returned to the SUV. The three men were still standing next to the SUV talking. Ortega asked Benita why she had returned. When she said no one answered the door, Ortega told her to go back to Regina's apartment. As she walked back, she called Regina and asked her to let her in. It was not unusual for Benita to show up at Regina's apartment late at night. When Benita knocked on the front door, Gabriel, Regina's ex-boyfriend, answered the door.

Benita went into Regina's bedroom and gave Regina a hug. While they sat and talked with Gabriel, Benita and Regina smoked some methamphetamine. After a short time, Benita went into the kitchen to eat something. Benita finished eating and returned to the bedroom to talk with Regina. Benita sent a text message to Ortega to come pick her up. He responded that they wanted to buy some drugs from Regina, and Benita should let them in when they got there. Benita did not mention Ortega or defendant to Regina.

Ortega repeatedly sent Benita text messages, asking her which apartment was Regina's. According to cell phone records, Ortega and Benita exchanged 42 text messages in the hour between 2:20 a.m. and 3:20 a.m. Benita sent Ortega Regina's address.

While Benita was still in the living room, and Regina and Gabriel were in the

3

front bedroom, Benita heard the back door open. She saw Ortega and defendant walk in the back door, which was unlocked. Benita went to the door and asked Ortega what he was doing because they just walked in. Ortega and defendant were wearing sweaters and they stood right next to each other with their hands behind their backs. Benita did not see a gun. Ortega put his hand on Benita's face and told her to shut up, and he guided her toward the door. Again, she asked him what he was doing and he told her to shut up. He said to her in a harsh whisper, "Shut up, Benita. I'm trying to rob this bitch." But Benita protested. Ortega told her "not to trip." He promised not to harm Regina. He said that "his word [was] with Bond," and he "put that on the block he wasn't going to hurt Regina." This meant that he was promising on his street and on the Bond Street Bulldog gang members with whom he claimed to associate. He repeatedly told Benita to go to the car, but she refused. She begged them not to do anything. Ortega was getting mad and he told her to "get the fuck in the car." Defendant pushed her out the door and promised not to let Ortega harm Regina. Benita was afraid. She left the apartment and walked to the alley. She was surprised to see that the SUV was now parked in the alley behind Regina's garage. The SUV was running and Verdugo was in the driver's seat. Benita got into the passenger's seat.

According to Gabriel, when Benita was in the living room looking at her cell phone, he and Regina heard a knock on the back screen door. Then Ortega and defendant barged into the room. Ortega was wearing a red beanie on his head and a red bandana covering his face. He was holding a rifle. Defendant was wearing a dark jacket with a hood over his head. Ortega immediately shot Regina and she fell to the floor. Defendant hit Gabriel on the side of his head with a fist. Then defendant yelled at Regina, "Where are your keys, bitch?" Defendant yelled at Gabriel, "Give me your shit." Gabriel gave defendant his house keys and said, "I don't have anything else." Defendant left Regina's purse on the bed and ran out of the room.

Ortega kicked Regina and asked her, "Where is the money, bitch?" While he was kicking her, he kept the rifle pointed at Gabriel, who was sitting on the bed. Gabriel was afraid and he regretted not being able to protect Regina. Ortega told Gabriel to lie face-down on the bed, but Gabriel refused to comply for fear that Ortega would shoot him in the back of his head. Gabriel held his hands up and said, "I don't have anything to do with this. I don't know what's going on." Ortega said, "I heard she's got a gun, too. Do you know where the gun's at?" Gabriel said, "I never knew about her having no gun." When Ortega again asked where the money was, Gabriel offered to look through Regina's purse for him. Ortega signaled for him to do it, so Gabriel grabbed the purse and dumped it on the bed. He found a gold bracelet, but no money.

Ortega said, "I'm going to kill this bitch." He told Gabriel he was going to kill him too because he thought Gabriel was going to try something. Ortega said he was getting an "itchy trigger finger" and he was "ready to die by the Fresno PD." Afraid for his life, Gabriel told Ortega, "My cousin is Donkey," referring to a cousin who was well-known in prison. Gabriel hoped Ortega would realize there would be retribution if he hurt him. Gabriel repeated that he would not do anything and that he did not know what was going on. Ortega told him to go sit in the hallway with his legs crossed and his hands on his head. He said, "I ain't going to kill you[;] it's this bitch." Gabriel asked Ortega why he was going to kill Regina, and he answered, "She burned my homeboy. Sold him 50 dollars worth of cut." This meant the methamphetamine appeared to be real, but was not.

Gabriel heard Ortega shoot the rifle a few more times, then Ortega said, "I'm

4

gone," and he ran past Gabriel. Gabriel thought the rifle sounded like a .22-caliber rifle. Gabriel waited about 10 seconds, then got up and went to Regina. He told her, "It's okay. Get up. They're gone." He picked her up and sat her on the bed, but she fell back on her back, unresponsive. He said, "They're gone. They're gone." She gasped for air and her eyes rolled back in her head. When Gabriel saw blood on his hand, he lifted Regina's shirt and saw a bullet wound near her pelvis. Only then did he realize she had been shot. He ran around the apartment looking for a telephone, then ran outside and told a neighbor to call 911.

Ortega returned to the SUV in the alley carrying his rifle and Regina's purse. Defendant backed Regina's red Geo Prizm out of her garage, and both cars returned to the house where the party was held.

Chica, a young woman at the party, came out and asked about Regina. Chica recognized Regina's car and asked Benita, "Is that Regina's car over there? [¶] ... [¶] Is Regina in there? Tell her to get down and say hi." Defendant told Benita not to say anything. Ortega told someone, "Take that bitch inside and tell her to shut up."

Chica saw Ortega come back into the house. Then she saw some girls looking through a purse that she believed was Regina's.

Benita stayed in the car, and after a few minutes, she, Ortega, and Verdugo left. Ortega dropped Benita off at her apartment.

Officers responded to Regina's apartment at 3:42 a.m., two minutes after being dispatched. The officers found Regina lying on the bed with her legs hanging down. She was gasping for air and her eyes were open, but her pupils were totally dilated and she was not blinking. Her eyes were becoming dry. The officers observed a small bullet wound in her right pelvis from a .22-caliber gunshot, and a small graze wound on her right arm. Regina was taken to the hospital.

Four expended .22-caliber cartridges were found in Regina's living room, hallway, and bedroom. A criminologist later determined that two of the four expended .22-caliber cartridges found in Regina's apartment had been fired by Ortega's rifle. Two of the expended cartridges could not be conclusively identified as having been fired by the rifle.

At 4:42 a.m., Benita received a text message from Ortega asking her how she was going to act. He said, "Man my girl. How gonna you act."

At 7:33 a.m., Benita received another message from him telling her he was leaving town. He said, "Cute, I'm gone b. Yo boy wiggin out." "I'm smashing out of town." "C U when I see U."

At about 8:00 a.m., Regina died at the hospital.

Also at about 8:00 a.m., Ortega gave Chica a ride to work. Ortega drove with a rifle across his lap. Defendant, who was also in the car, had a long, samurai-type sword.

At about 10:00 a.m., Ortega and defendant came to Benita's apartment. Benita asked Ortega what had happened, but he shook his head and did not answer. He kept saying, "Get your stuff[;] we're going to the mountains. We can't be here." Then he said, "I think I murked [Regina]," which meant he thought he had killed

5

her. Benita started crying and told Ortega to get out. He put his head down and repeated that he was sorry. Defendant just shook his head. Benita told them to leave.

At 7:31 p.m., Benita received a text message from Ortega. He said, "[M]y dog, answer da phone. Hella important. Number 007." He had sent her many other messages and he kept calling her, but she did not want to talk to him and she refused to answer.

At about 11:30 p.m., a woman walking in her neighborhood saw an SUV parked behind a small red Geo. Ortega and two other men in dark clothing were standing by the red Geo. They poured gas over the red Geo, set it on fire, and drove away. The woman had previously seen Ortega and a neighbor pushing the red Geo into the neighbor's back yard. A few days after the car fire, the neighbor threatened the woman, telling her to keep her mouth shut or what had happened to her friend would happen to her.

On April 1, at about 8:00 p.m., undercover officers observed Ortega walking with a limp and an obvious bulge in his clothing. They watched him place a .22-caliber rifle, containing a loaded magazine of nine live cartridges, behind a gas station and quickly walk into an adjacent fast food restaurant, where the officers apprehended him. Defendant and Verdugo were not with him.

Ortega was carrying keys to the SUV, which was parked nearby. The SUV's license plates were covered with Auto Maxx paper plates. Ortega was also carrying a cell phone, a red bandana, and some papers, one of which was signed by "Little Demonologist." When the detective, who was present at the scene, picked up Ortega's cell phone and looked at it, he immediately saw a "wallpaper" (background) photograph displayed on the phone's face. It was a photograph of a male wearing a red hat down to his eyebrows, a red bandana over his face (revealing only his eyes), and red clothing. [FN3.] When the detective examined the contacts in Ortega's cell phone, he found someone referred to as "Mellow Bonded 007," with a number the detective knew was defendant's number, even though it was registered to someone else.

FN3. The detective testified the male in the photograph was wearing red clothing, but it appears to us he was wearing a shirt that was predominantly light blue.

The SUV contained five live .22-caliber cartridges and six expended .22-caliber cartridge casings. The criminologist later determined that four of the six expended .22-caliber casings had been fired from Ortega's rifle. The others were inconclusive. The SUV's glove compartment contained several CD's, four of which had Regina's name written on them. Regina always signed her name on her things. Behind the seat was Regina's daughter's toy.

When the police searched defendant's bedroom, they found a samurai-type sword in a case and a CD case between two mattresses on the floor. They also found CD's and a CD case, all with Regina's name on them.

The detective testified that, about 30 hours before Regina was shot (i.e., at about 9:40 p.m. on March 27), Ortega left someone a voicemail message (the parties stipulated it was not left for either defendant or Verdugo). The detective recognized Ortega's voice. In the message, Ortega said, "Aye Bulldog man. [¶] ... [¶] I been cup caking with some little hoe ass beezee ... nigga ..., you know what I mean? [¶] ... [¶] Hit me up boy, Little D." At this point, a female voice could be

heard in the background. Then Ortega said, "Lay down this ... hit me up boy. [¶] ... [¶] I need the strap at least, man." The detective testified that the term "strap" meant a firearm or gun.

Also on March 27, Ortega left a message for "Mellow" on a cell phone registered to someone named Dominguez Perez. The cell phone contained seven voicemail messages that mentioned the name "Mellow."

The pathologist who conducted the autopsy of Regina's body found four gunshot wounds: a grazing wound on her upper right arm, a wound through her right thigh, a wound near her vagina, and a wound to her right hip. The bullet that caused the wound to her hip injured her iliac artery and vein, and caused her to bleed to death.

*Bifurcated Trial*

At the bifurcated trial, Gabriel testified that Ortega's use of the word "dog" and the red bandana he wore on his face led Gabriel to believe that Ortega and defendant were in the Bulldog gang. Due to this belief, Gabriel mentioned the name of his cousin, "Donkey," who was a known Bulldog, hoping his life would be spared if they knew he was related to someone in their gang.

The gang expert testified there are no "shot caller[s]" in the Bulldog gang; the mentality is every man for himself. Bulldog gang tattoos include the words "Fresno" and "Bulldogs," the letters "FS," and pictures of actual bulldog faces and bodies. There are three main sub-groups of the Bulldog gang: the Fresno Bulldogs, the East Side Fresno Bulldogs, and the North Side Fresno Bulldogs. Each sub-group uses a tattoo to differentiate themselves such as "FB," "ESF," and "NSF," respectively. Each sub-group has further sub-groups; the Bond Street Bulldogs are the largest sub-group of the East Side Fresno Bulldogs. In addition to the general Bulldog tattoos noted above, Bond Street Bulldog tattoos consist of the words "Bond" and "Bond Street," the letters "BSD," and the numbers "007." Primary activities of the Bond Street Bulldogs include assault with a deadly weapon, murder, arson, robbery, vehicle theft, assault, battery, and numerous other crimes. In the expert's opinion, the Bond Street Bulldogs are a criminal street gang.

The expert testified that a hypothetical crime, very similar to the crime at hand, would benefit a criminal street gang because it would bolster the gang's reputation for using violence to regain respect, and defendant's actions benefitted the gang because he was acting as "crowd control." Respect is everything to a gang member; committing a crime to avenge a fellow gang member who was ripped off increases that respect. As a result of this type of crime, other drug dealers would know not to sell their gang "cut" drugs. In the expert's opinion, this crime was associated with the Bond Street Bulldogs.

The expert translated Ortega's voice-mail. "Aye, Bulldog man" meant "How are you doing[?]" or "What's up, Bulldog?" "Bond up and call me back" meant "[G]et ready, I might need you to do something, commit a crime or [a] number of things." "I need the strap at least, man" meant that Ortega was looking for a gun. The expert further explained that the phrase "[B]ond up" is not normally used in casual conversation, nor is it used by or towards a non-gang member. "[B]ond up" is normally used only among gang members to discuss perpetrating criminal acts or taking care of business for their gang.

7

The police use several criteria to determine whether or not someone is an active participant in a criminal street gang. If three of the criteria are met, a person could be classified as an active gang participant. The criteria include self-admission of membership to an officer, gang tattoos, association with known gang members on a regular basis, gang graffiti on documents, correspondence with gang members, arrest in the company of known gang members, identification as a gang member by a reliable source (teachers, law enforcement, parents, rival gangs), name on graffiti or roll call list, and appearance in a photograph with known gang members.

Ortega, with whom defendant committed the crimes, repeatedly admitted that he was an "ESF" gang member, including during five different jail classification proceedings. His tattoos included the word "FRESNO" with the letters "ES" emphasized, the letters "ESF" and "BDS," the letter "B," one bulldog body, two bulldog faces, and three "dog paws."

In the expert's opinion, defendant was a current, active participant in the Bond Street Bulldog gang. On eight different occasions, defendant admitted being in the Bulldog gang, and on five of those occasions, he specifically indicated he was a Bond Street Bulldog. Defendant's tattoos included the words "FRESNO," "BULLDOG," and "BOND STREET," and three bulldog faces. He also had the letter "B" on his face, which was "like a billboard" because he was showing his level of commitment to the gang. Defendant was in two photographs with known Bond Street Bulldog gang members. In one of the photographs, defendant was "throwing" gang signs.

*Defense Evidence*

The expert testified that two active gang participants could commit a crime together for non-gang-related purposes-for example, to obtain more drugs. The word "dog" is not specific to gang members, but is also used in popular culture. Similarly, the color red is not exclusive to the Bulldog gang. Also, a non-active gang member could claim to be in a gang during jail classification for protection purposes.

(LD[3] 8 at 4-13.)

### III.

### DISCUSSION

**A.    Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of Fresno County

---

[3] "LD" refers to the documents lodged by Respondent with his response.

Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.     Standard of Review

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75-76. The writ may issue only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784. In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered

1 unreasonable.  Id.  If the Court determines that the state court decision is objectively
2 unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the
3 error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619,
4 637 (1993).

5  Petitioner has the burden of establishing that the decision of the state court is contrary to
6 or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.
7 Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the
8 states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a
9 state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669
10 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

11 AEDPA requires considerable deference to the state courts.  "[R]eview under §
12 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on
13 the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."
14 Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations
15 by state courts are presumed correct absent clear and convincing evidence to the contrary."
16 Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a
17 state court factual finding is not entitled to deference if the relevant state court record is
18 unavailable for the federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963),
19 *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

20 **C.     Review of Claims**

21 Petitioner raises two separate claims for relief but they are essentially the same claim.  He
22 contends the evidence was insufficient to prove the robberies were committed with the specific
23 intent to benefit, promote, or assist criminal street gang activity.

24 This claim was presented on direct appeal to the state appellate court and it was denied in
25 a reasoned decision.  Petitioner then raised the claim to the California Supreme Court in a
26 petition for review.  The petition was denied without comment.  When the California Supreme
27 Court's opinion is summary in nature, the Court must "look through" that decision to a court
28 below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3

(1991). Here, the appellate court analyzed and rejected the claims as follows:

> Defendant contends insufficient evidence supported the finding that the robberies were committed with the intent to benefit or promote criminal gang activity; therefore, the gang enhancements under section 186.22, subdivision (b) and, consequently, section 12022.53, subdivision (e), should not apply. Rather, he asserts the crimes were committed to obtain drugs and/or money to buy drugs. We disagree. There was ample evidence to support the finding that defendant was involved in a gang, and intended to advance criminal gang activity within the meaning of section 186.22, subdivision (b).
>
> "'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Bolden* (2002) 29 Cal.4th 515, 553.) "It is not our function to reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We may not reverse a conviction for insufficiency of the evidence unless it appears "'that upon no hypotheses whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must draw all reasonable inferences in support of the judgment. (*People v. Wader* (1993) 5 Cal.4th 610, 640.) Although we review the whole record, "[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296; *People v. Panah* (2005) 35 Cal .4th 395, 489.) This standard equally applies to a claim of insufficiency of the evidence to support a gang enhancement. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 660.)
>
> For a gang enhancement under section 186.22, subdivision (b) to properly apply, the defendant must have committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22, subd. (b)(1).)
>
> In *People v. Vazquez* (2009) 178 Cal.App.4th 347 (*Vasquez*), expert witness testimony "that violent crimes ... increase 'respect' for the gang and facilitate its criminal activities by intimidating members of rival gangs and law-abiding neighborhood residents" was sufficient evidence to support a finding under section 186.22, subdivision (b). (*Vasquez, supra*, at pp. 353.) The *Vasquez* court further noted that intimidation benefits the gang by "elevat[ing] the status of the gang within gang culture." (*Id.* at p. 354.)
>
> "Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1197-1199 [intending to commit and/or aid and abet a robbery in association with fellow gang members was sufficient evidence that the defendant intended to assist criminal gang activity].) "[I]f substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other gang members, the jury may fairly infer that the defendant also intended for his crime to promote,

12

> further or assist criminal conduct by those gang members. [Citation.]" (*Vazquez*, supra, 178 Cal.App.4th at pp. 353-354.)
>
> Here, sufficient evidence supported the gang enhancement under section 186.22, subdivision (b). The expert testified that the crimes committed would benefit a criminal street gang because other drug dealers would not sell the gang "cut" drugs, and the gang's reputation would be bolstered by using violence to regain respect. Defendant committed the crime in association with Ortega, a known gang member, and that alone was sufficient to support a finding that he had the specific intent to "promote, further or assist" under section 186.22 subdivision (b). (*People v. Villalobos, supra*, 145 Cal.App.4th at p. 322; *People v. Morales, supra*, 112 Cal.App .4th at pp. 1197-1199.)
>
> Similarly, the enhancement under section 12022.53, subdivision (e) was also properly imposed on both robberies. Section 12022.53, subdivision (e), states: "enhancements provided in this section shall apply ... if.... [¶] (A) The person violated subdivision (b) of Section 186.22 [and ¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d) [which involve using a firearm in the commission of a felony]." (Italics added.) In this case, because the use of a firearm by a principal was not in dispute, a finding under section 186.22, subdivision (b) supported a finding under section 12022.53, subdivision (e). Both enhancements were sufficiently supported by evidence and properly applied to both robberies.

(LD 8.)

The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On federal habeas review, AEDPA requires an additional layer of deference to the state decision. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005). This Court must determine whether the state decision was an unreasonable application of the Jackson standard.

Sufficiency claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324 n.16. Cal. Penal Code § 186.22(b)(1)'s gang enhancement may only be applied if the prosecution proves the following two elements beyond a reasonable doubt: (1) that Petitioner committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that he did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members." To sustain the imposition of a gang enhancement pursuant to Cal. Penal Code § 186.22(b)(1), "there must have been evidence upon which a rational trier of fact could find that [a defendant] acted with the 'specific intent to promote, further, or assist in'

13

1  some type of 'criminal conduct by gang members,' which may include the crimes of conviction."
2  Emery v. Clark, 643 F.3d 1210, 1216 (9th Cir.2011) (quoting Cal. Penal Code § 186.22(b)(1).)

3      In this case, the appellate court applied the correct standard in reviewing the claim by
4  viewing the evidence in the light most favorable to the judgment to determine whether a rational
5  trier of fact could have found the defendant guilty beyond a reasonable doubt.  Moreover, it
6  cannot be said that no fairminded jurist would agree with the state court's decision.  There was
7  ample evidence from which to conclude that Petitioner committed the home invasion robbery in
8  association with a criminal street gang, and with the specific intent to promote, further, or assist
9  criminal conduct by gang members.  Petitioner was an admitted associate of the Bond Street
10 Bulldogs and he committed the crimes in association with Ortega, a fellow gang member.  As
11 noted by the appellate court, prior to the attack, Ortega told Benita that "his word [was] with
12 Bond," and he "put that on the block he wasn't going to hurt Regina."  This meant that Ortega
13 was promising on his gang that he would not harm Regina.  Nevertheless, when Ortega and
14 Petitioner broke into the residence, Ortega immediately shot Regina while Petitioner hit Gabriel
15 in the head.  When later asked why he was going to kill Regina, Ortega said it was because she
16 sold his "homeboy" "50 dollars worth of cut," which meant she had sold his associate weak or
17 fake drugs.  The state court noted the expert testimony that Ortega's and Petitioner's actions
18 served to benefit the criminal street gang because other drug dealers would be disinclined to sell
19 the gang "cut" drugs, and the gang's reputation would be bolstered by the use of violence in
20 retaliation for a wrong done to a fellow gangmember.  The morning after the crime, Petitioner
21 and Ortega planned to flee to the mountains together.  A witness, Chica, testified that Ortega
22 drove with a rifle across his lap while Petitioner had a long, samurai-type sword.

23     In these circumstances, it would not be unreasonable to conclude that a rational trier of
24 fact could have found that when Petitioner and Ortega acted together to commit the robbery and
25 murder, Petitioner specifically intended to "assist in" criminal conduct (murder and robbery) by
26 known gang members (himself and Ortega) within the meaning of section 186.22(b)(1).
27 Accordingly, the state court rejection of Petitioner's claim was not contrary to or an
28 unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. §

2254(d)(1). The petition must be denied.

## IV.

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment.

This Findings and Recommendation is submitted to District Judge Anthony W. Ishii pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within fourteen (14) days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **March 24, 2014**

UNITED STATES MAGISTRATE JUDGE